Case No. 17-6502 Joseph Stearman v. Ferro Coals Incorporated, et al. Oral argument not to exceed 15 minutes per side. Mr. Cannon for the appellate. May it please the court, Mr. Moore. Good morning, your honors. My name is Dan Cannon and I am here to represent Joe Stearman, the plaintiff in this action, who is present in the courtroom today. I also have two students, first year law students, from the University of Louisville Law School that are in attendance. They cannot wait for their oral argument, their appellate argument next semester, so they're getting an early start studying up for that. We appreciate you accommodating them and me on this case. It's a case that I care about a lot and I think the district court got very wrong. Mr. Stearman worked for five years for the defendant without incident, without a write-up, without any adverse employment action or even counseling whatsoever. And all within a very short period of time, about six months, he had a heart attack, he had a recurrence of prostate cancer, his mother died, and his wife nearly died, coded, of a heart attack. Two days after his wife's heart attack, Mr. Stearman was abruptly terminated by the owner of the company, who was then 32 years old. He was back at work, though, at that time. He had come back. Was he working at that time? He was called into a meeting specifically to be terminated, but his wife was in the hospital at that point in time. Was he working at that time? I'm sorry? Was he working? Was he on the payroll at that time? He was. Yes, sir. He was on leave for his wife. The reason that was given to the Kentucky Unemployment Insurance Commission, I think this is important because the district court managed to glide right over it, but the reason that was given by the employer to the Kentucky Unemployment Insurance Commission was that he was in violation of a no-travel-without-permission policy that dated back to 2012, that was disseminated via an email that went from the owner of the company to the office manager. He violated that policy by attending a conference that was part of his regular job duties and that he had attended every single year of his employment. It was a conference for which he had notified the employer that he was going to attend and a conference, in fact, for which he was reimbursed for his expenses prior to his termination. The Kentucky Unemployment Insurance Commission, a hearing officer, heard evidence in that case and rejected the reason that was proffered by the employer because they basically said that the policy did not exist. It wasn't uniformly enforced. It was never applied to any employee. Employees routinely traveled. The evidence that was discussed at that hearing was that Mr. Stearman and another employee routinely traveled as part of their normal job duties with and without permission. On other occasions, did he get permission or just go to the convention? I think that it was a casual environment. What the record shows is that it was a sort of casual environment both before and after this email was sent in 2012. It's a small company. They come and check in and say, hey, I'm going to this conference. Sometimes they would tell the owner about the travel and sometimes they wouldn't. That's the evidence that we've uncovered in litigation in this case, and that's what the hearing officer heard in the Unemployment Insurance Commission hearing. Once suit was filed in this case, you see nearly a year after the Unemployment Insurance proceedings, you see the employer coming up with all these different reasons why. They're different and they're self-serving and they're incredibly transparent reasons why Mr. Stearman was terminated. Most salient among them, and the one that I think the district court was able to swallow a little bit, was that the position was eliminated, that they had been thinking about eliminating the position for years. So not only was he terminated for cause at the time that he went to the Unemployment Insurance Commission, but also his position was eliminated and we were thinking about doing that for years. Where's the evidence for that? We don't have any. Where's the communication between owners of the company saying, let's eliminate this position? There is none. Well, they eliminated a whole lot of positions there, didn't they? They have at this point, Your Honor. I believe they have. By the time that we took that- Down to practically nothing. I don't know- They were losing money at some point. The case has been fully briefed for over a year, Your Honor. I don't know where they are. What I do know is that in 2014, when Joe was terminated, they were doing better than they were in 2013. When he made the same trip to the same conference, there's no record that he obtained permission for that either. He wasn't disciplined. He wasn't counseled. Nothing happened to him. So the Unemployment Insurance Commission rightly determined that this wasn't a real policy, that this preapproval for travel policy just didn't exist. And I think that's important on the issue of pretext in particular. But the point here, just a preliminary point, is that there were many, many reasons. There have been many reasons that have surfaced, that have come from this employer, as to why Mr. Stearman was terminated. All those reasons are self-serving, rather. They are for the purpose of whatever proceeding we're in at the time. And we've managed to debunk just about all of them. At the time- He was not replaced by a new hire. That's correct. And the district court treated that as a bright-line rule, basically. How can you comply with the various cases in terms of showing that the work that was taken over by the existing employees satisfied the prima facie test? And this is why I was kind of going back through the facts in an extensive way. Because we have, at the beginning, the employer saying he was terminated for cause, when it suits their purposes in front of the Unemployment Insurance Commission. Later, it becomes, this position was eliminated. It becomes a sort of reduction in force-type argument. And the rule that Your Honor is referring to, and the rule that the defendant has urged in this case, and ultimately that I think the district court adopted, supposedly comes from this Grosjean or Grosjean case. But it has never been applied. A rule that says, essentially, you can't make a prima facie case if you didn't have a one-to-one replacement. If somebody wasn't hired in. That's the bright-line rule that the district court drew. So if you have an employee like Mr. Stearman, whose job duties are simply given to someone else who retains their own job duties, even if it's a termination for cause, then that completely precludes liability. I think that's an extremely dangerous rule. I think it's a bright line that has never been drawn in any case. And the importance about the reason underlying his termination. The prima facie case doesn't necessarily preclude liability. You could show somebody testified, I did this action because he was in a protected class. You could still have liability. You just don't get to the case when you're doing a circumstantial case. Is that correct? So your threat is a little bit overstated. Well, so I think the way in which the court appeared, the lower court appeared to have, I agree with you, Your Honor. I think the way in which the lower court appeared to treat. I agree with you, and it was a little bit of an overstatement what you said there. Yes. I may be, my students will tell you I may be prone to hyperbole at times. But I do believe that that is not the way in which this court has applied that rule. It's never applied in any meaningful way outside of a reduction in force context. And when I say reduction in force context, I mean an undisputed reduction in force case where you have positions that have been eliminated. But then the plaintiff is saying that I was eliminated for some sort of discriminatory reason that drove my particular position being eliminated versus anybody else. There's never been a question that this case is a termination for cause. They've changed the reason for the cause several times and have tried to also work in an elimination argument at the district court. And so what that has allowed them to do is to then borrow from this line of cases, including Grosjean, that says there's this rule that if it's not a one-to-one replacement, that if a plaintiff can't maintain a prima facie case for age discrimination, if his duties are given to another worker who just maintains some of their own duties. Is the primary thrust of your case age discrimination or because he had been sick and been off or something else? I think age discrimination is our better cause of action, Judge. We have alleged age and disability discrimination both. But the reasons for Mr. Stearman's leave and the misfortune that he experienced during that six-month period of time are all basically the trappings of age. What was the difference in age between his and the man who took over his duties, who's already had another job? Twenty years. Twenty years. What we have in a nutshell here is a close nexus. This is why I'm so surprised by the district court's decision. We have a close nexus in time between age-related leave and his termination. We've got inconsistent and varied lies about the reason for that termination coming from the employer itself. And we have a much younger employee in an e-mail openly assuming all the duties of Mr. Stearman and telling his account contacts that he retired, which, of course, is not true. But to go back to Your Honor's question about the replacement line of cases, as I said, the Grosjean rule has only ever been applied in undisputed reduction of force cases. The only possible exception to that is Grosjean itself, in which there was no termination for cause. And that case discusses the replacement standard but ultimately holds that the age disparity between the employee and the replacement was not big enough. That's really the basis of Judge Boggs' opinion in that case. The opinion is almost entirely focused on an age difference without a substantial discussion of redistribution or reassignment of duties. And we have cited to two Kentucky cases that have come out since Grosjean, one in the Court of Appeals and one in the Supreme Court, both interpreting the Kentucky Civil Rights Act and saying that Grosjean really only applies to reduction in force cases. And if you look back, and this is the interesting aspect of this too, if you look back at the bases for Grosjean, there's a case called Barnes v. GenCorp that we cite to in our briefing and that is cited extensively in Grosjean itself. That is a reduction in force case in which the positions were consolidated. So you have older workers saying, they eliminated my position and gave my job duties to a younger worker who was already there. And even that wasn't applied in the way that the district court applied that rule here. And you have, in fact, they still undertake, as Your Honor suggested, they still undertake a case-by-case analysis, a plaintiff-by-plaintiff analysis and say, was there discrimination here? Is there enough to show discrimination? But they don't look at it and say, simply because somebody else who already is at this company absorbed your job duties, simply because of that, then we're going to toss your whole case. That doesn't make sense and it's not a workable rule. The Barnes case specifically says, speaking about an employee that replaced another employee, Miller, the employee who was the replacement, was retained, continuing his in-process testing and assuming some of Millis's, the plaintiff's, duties in addition to his own testing work. How old was the plaintiff when he was initially hired by this company? I believe he was 62. He was in the adult group there that's protected, right? So he was already in that age group. Absolutely. Yeah, absolutely. And he remained the oldest person on the payroll. He was the only person in his 60s, he was by far the oldest person on the payroll at the time of his termination. No one else was experienced in his age group. So he was hired as an adult elderly person and he was fired as an elderly person is what you're saying. That is correct. But that's not dispositive as to the issue of age discrimination because he was, as I said at the beginning, he was allowed to do his job unfettered. He was allowed to do all the travel he wanted with or without permission. He was allowed to travel frequently and that's what the record demonstrates. That's what the Kentucky Unemployment Insurance Commission found is that he was able to do all these things without adverse employment consequences, without being counseled, without any sort of problems whatsoever until he started having problems that required him to take leave and those problems were collateral to, as I said, the trappings of age. I see that my time is up. So if there are no further questions, I'll yield to Mr. Moore. Thank you. Thank you. May it please the court, your honors, Mr. Cannon. The district court's summary judgment in this case should be affirmed for three primary reasons. First, Mr. Stearman cannot make out a prima facie case of age discrimination. Nor can Mr. Stearman make out a prima facie case of age discrimination. Didn't you say the same thing twice? I did, Judge. I meant disability discrimination. And finally, your honor, Mr. Stearman also has other claims pending here that were addressed and dismissed by the district court, including an Equal Opportunities Act claim, an ERISA interference claim, a Kentucky Wage and Hour Act claim, and a conspiracy claim. Those claims also were all properly dismissed by the U.S. District Court for the Western District of Kentucky on summary judgment. Before addressing the prima facie case requirements of age discrimination, your honor, I do think it's important to address a few things that were pointed out or asserted to this court during the appellant's oral argument. This court was told that Mr. Stearman, the policy regarding travel, was casually or loosely applied before. Here's the difference. In 2014, the conference that Mr. Stearman went to in Myrtle Beach, he sent an email to the president of the company, Vess Bennett, who's sitting right here today, and their employees, Gail Huff, the office manager, and said, hey, can I go to this conference? He never heard back. No authorization. Didn't get a yes or no, nothing back at all. There's a difference there between that and all of the other times that Mr. Stearman asked to go on company-approved travel. Every other time, he received specific pre-authorization to go. So your opponent has said that, first of all, he was reimbursed by the company for that trip. Is that correct? Is that a fact in the record? He used the company credit card on the trip, and therefore the company had to pay its credit card bill, so that bill was paid, your honor. And then did the company seek to collect back the money from him? No, your honor, not that I know of. They simply fired him. That's correct, your honor. Without telling him you made a mistake, you shouldn't have used the company travel card. The last part, your honor, is not correct. I'm asking it as a question. Your honor, the last part there that he wasn't told, when Mr. Stearman came to that meeting after his wife and mother, his wife passed, his mother passed and his wife was sick, After that meeting, Mr. Stearman produced some notes that are in the evidence of this case. And those notes show that when Vess Bennett, who was having a meeting with him on behalf of the coal company, when he was pressed on the reasons, Vess said, Myrtle Beach, you violated the travel directive. He told him that right there at that meeting in Mr. Stearman's own hand. Also, in terms of the evidence that's been alleged is inconsistent in this case, your honor. We've heard this throughout the case that the position of Farrow Coals here has been ever changing. The position has been the same from the very beginning, from the notes that I just mentioned in Mr. Stearman's own hand, that he violated the travel directive. The travel directive was there not only from the 2012 email, it was also in the employee handbook that you had to have specific pre-authorization, specific pre-authorization to travel. And he always got it before 2014. His lawyer says that the unemployment group compensation board or whatever it's called, already found that that was not the reason for his termination. Are we bound by that or is that erroneous or what's the situation? Your honor, I guess to start with the last question first. No, I don't think we're bound by what happened at the unemployment commission. What happened there is that Farrow Coals was not represented by counsel. C.V. Bennett III, who is now passed, he was the owner of the company, wrote a letter to the unemployment commission and said that Mr. Stearman was terminated for violating the policy. And he also mentioned that it's documented Mr. Stearman was notified in August of 2012 that all travel had been suspended until further notice due to current market conditions. So no, your honor, to answer your question, I don't think that the unemployment commission's findings in that case where Farrow Coals was unrepresented by counsel are binding on this court in any way. Doesn't it show a fact question that may preclude summary judgment here? Your honor, I think that there could be a fact question there but not in the prima facie case analysis. We've got to step back and maybe I should address that here. In this case, that fact analysis would properly be addressed under the actual motivation standards in the third part of the McDonnell-Douglas analysis for age discrimination. Here, however, Mr. Stearman cannot make out a prima facie case. Everybody in this case agrees that Mr. Stearman has made out a case on the first three prongs of McDonnell-Douglas. The issues prong four, the replacement prong. In this case, Mr. Stearman was not replaced. What happened here was Mr. Stearman's job duties were assumed by an existing employee, Mike Canada, who was about 20 years younger. I might add Mr. Canada was within the protected class at the time. He was over age 40 but he was significantly younger. We don't dispute that. Mr. Canada took on Mr. Stearman's job duties in addition to his other ones. It's important here, Mr. Canada's jobs before included sales, included going to customers. He then, when Mr. Stearman separated from employment, Mr. Canada took on those responsibilities in addition to his others. He even testified that picking up the slack didn't make that big a difference to him. I think it's important in this case to realize the context that we're talking about. Mr. Stearman was employed in 2009, terminated in 2014. During that five years, the coal industry in eastern Kentucky has seen a marked, unprecedented decline. There's no question about it. His lawyer says that they made more money that year he was fired than they did the year before. Your Honor, the evidence in this case from document 50-4 shows that in 2014, Farrow Coals lost $191,742 as opposed to the year before. They lost money every single year that Mr. Stearman was employed. Every year, okay. Every single year they lost money. Every single year, except for his first year. They made money his first year, and then during his five-year employment, they lost money every single year. That's because, obviously, the coal industry in Kentucky and nationwide, the decline is marked. The largest coal producers in the United States have declared bankruptcy, have ceased operations, have shuttered. Coal operators have switched from coal to natural gas. In fact, that's what happened to Farrow Coals' biggest customer in 2014. They switched from coal to natural gas. Obviously, that was a big problem for Farrow Coals' business. Therefore, the need for a sales position like Mr. Stearman became dramatically reduced from 2009 to 2014. This is all context, however. Again, Mr. Stearman, nobody was replaced. Nobody was ever hired. In fact, not only was there not anybody hired to replace Mr. Stearman and himself, there have been no hirings at all, period, at Farrow Coals since he was let go. The only thing that's happened at Farrow Coals during that period of time is people getting laid off. There are now three people at Farrow Coals. Your opponent made a major part of his argument, the idea that the replacement doctrine of gross gene and other cases was applied only in RIF situations. And this was not presented as a RIF. It was presented as a discharge for cause. How do you respond to that? When you say RIF, Your Honor, we're talking about a reduction in force. Reduction in force. Absolutely. Your Honor, gross gene itself was not a RIF case, if I understand it. Gross gene was the 2003 case out of this court where a yard worker at a power plant was demoted. That case isn't about reduction in force. That case, a large part of that case, was about what was a substantially younger replacement versus not, whether three years was enough or 20 years was enough. But gross gene itself, which cited Barnes, is not a reduction in force case. It's not a workforce case. The replacement prong here, and I think the history of the... That's responsive to Judge Moore's question. I took her question, correct me if I'm wrong, it was that there's two different theories going on here. One is that they're contracting, and that's why they let him go. And the other is he did something wrong, and that's why they let him go. Is that fair? Yes. How do you respond to that tension without citing cases that are cited in cases that are cited in cases? Fair enough, Judge. The tension that you refer to, I see is, in this case, Mr. Stearman was terminated for violating a company policy that had to do with the company's funds in the context, or the broader context, of a market industry decline. In other words, Mr. More likely to believe that they fired someone for something that was spending too much money in the context of a contraction. Correct, Your Honor. Thank you. I do think that the evolution of the replacement prong cases in this circuit is important here. It started with a case called Sahadi back in 1980. And that's where the plaintiff's job in that case was eliminated during a riff. The plaintiff wasn't replaced, and his former duties were assumed by another employee. There's been allegations in this case that the elimination of the VP of Sales position that Mr. Stearman held is something that's been newly cooked up by Ferro-Coals and its lawyers after litigation. The evidence in this case, and the documents in this case, are that there were prospective buyers for Ferro-Coals before the termination. And the prospective buyers did a valuation of the company and did a profit-loss type look at the company. That's in evidence in this case in document 50-5. A review of that document will show that there is no VP of Sales position. That sales position has been eliminated in the projections by the buyer of the company. Now, the buyer of the company didn't buy the company, presumably because the company lost its biggest customer shortly thereafter. But in this case, that position was eliminated. This is a Sahadi type case. Mike Canada assumed the responsibilities of Mr. Stearman, and the company went on. Now Barnes came along 10 years later in 1990. Barnes was a hostile takeover case involving lots of plaintiffs, involving subsidiaries of GenCorp that included General Tire and other major corporations. That case, again, citing Sahadi, says a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties. As in, reassigned, taken from their old job and their old job description, and put into a new job with a new job description. Grosjean then came along 13 years later outside of the RIF context. And that's where we are today. Here, the position was eliminated. Mr. Stearman wasn't replaced. And Mr. Stearman can't meet the replacement prong for age discrimination required by McDonnell Douglas. I might also add, when it comes to disability discrimination, which I missed on my opening, your honor, there is a replacement requirement there, a prima facie replacement requirement there, and it's the same situation. Nobody replaced Mr. Stearman. Now, when it comes to disability, however... I would think that sales would be an important role to have in a company. Especially in an economic downturn. Right. So why isn't it simply a relabeling of the plaintiff's job that's now taken over by this Mr. Canada? But say Mr. Canada was only working a quarter time on whatever he was doing and now is adding for three quarters of his time what Mr. Stearman was doing. Why wouldn't that be a replacement situation, hypothetically? Hypothetically or actually, Judge, here the reason is because there were no sales opportunities. Because of the industry decline, Ferrocoals was a broker, and the people that they were trying to sell their coal to, to power their plants, to power their schools or their hospitals, weren't there anymore. There were no sales opportunities. And therefore, the sales position really... Hiring more salespeople was not going to generate more revenue. It wasn't out there because of the change in the industry is what had happened, Your Honor. After Canada took over these positions or responsibilities, how did... did he sell a lot of coal after that? What do we know about that? Your Honor, I see I'm out of time. Could I... Your Honor, no, they did not sell a lot of coal after that time. Again, I might also... Mr. Canada is no longer employed at Ferrocoals. No, the business has continued to lose money. There's no new customers. All the company is doing is fulfilling its existing contracts. And the evidence in this case is that the company will wind down after the termination of their current contracts. No new sales. Thank you. Thank you, Your Honors. Your Honors, I think I could appreciate the arguments of counsel just now and throughout this case a whole lot more if this were actually a case in which Mr. Stearman was told his position was going to be eliminated because they just couldn't afford to keep him around anymore. That's not what they told him. And in the darkest hour that this man has probably had on earth, what they had chose to do instead was to say, bring him into the owner's office, say, sorry about your luck, you're fired while your wife is in the hospital, and oh, by the way, here's this pittance of a severance agreement that they tendered to him. Even though he was terminated for cause, they gave him a severance agreement that he refused to sign, and then they decided to fight his unemployment based on this violation of a travel policy that did not exist. That was to the company's benefit if he was fired for violating the travel rule because he wouldn't have to pay unemployment, right? Absolutely right. And then that reason changed when we got to this litigation. When we got to the courthouse, then it was, oh, we were thinking about eliminating this position for years. Again, no affirmative evidence of that other than the financial condition of the company. But if he was not replaced by somebody else, that's still a ground for letting him go, right? I'm sorry? They can't let him go just because they don't like the way he combs his hair or something like that, right? Yeah, I mean, they just can't fire him. As long as it's not age. Regardless of the reason for his termination, regardless of who replaced him, I mean, I think that he can't be dismissed for a discriminatory reason. And that's been our whole point is that this shifting basis for his termination demonstrates pretext. But if that were not enough, I think you can go to the deposition testimony of Mike Canada in this case where he says, and I'm looking at page ID 384. It's document 4616. It's Mike Canada's deposition. And I talked to him in there extensively as I talked to the owner of the company extensively in his deposition about who traveled, when did they travel, what was the preapproval process. There was no preapproval process. There's no documentation that suggests. And Mr. Canada says, I would travel to Cincinnati, Lawrenceburg, Indiana, Louisville, Kentucky, Kingsport, Tennessee. He talks about going to Keeneland. He says, I stayed on the road. So you'd think that there would be extensive documentation or at least some indication somewhere that these employees were asking for permission to travel repeatedly. That just doesn't exist. And that's what the Kentucky Unemployment Insurance Commission found. I think that should get us over the pretext wall for purposes of just trying to get this man's case to a jury. I think that an administrative determination from a hearing officer that says this is pretext should be enough to get us over the pretext wall. Go ahead. Did Mr. Bennett or whoever wrote to the unemployment just send a letter and didn't have any appearance there? No, both sides were heard at that hearing. With or without counsel, both sides were heard at that hearing. Mr. Bennett testified at that hearing. Counsel was there at both places? I was there. I don't have any reason to doubt what Mr. Moore said. I don't believe they were represented by counsel. But the owner of the company testified in that hearing, and that was the administrative determination. And if you will indulge me for just one second longer, I'm looking at page ID 418. It's 46-17. This is an email, and you never have this. I've done plaintiff-side employment work for more than a decade. You never have this kind of evidence in an employment case, but here it is. I want to let you know that Joe Stearman, recently retired from Cumberland Elkhorn Coal. Retired. I will be taking care of all of Joe's duties for the foreseeable future. If that is not a replacement-type situation, then the wall is too high for plaintiffs to get over. So we ask that you reverse the district court's decision and remand. He's got seven or eight people, and you let one go,  and they wrote that kind of a letter. All of those duties will be accomplished by these seven people. You would be arguing the same thing, or that would be different? I would be arguing the same thing, Your Honor. That does sound like a riff. Even if they use the wrong word, retired. If it were a reduction-of-force-type situation, then I think that we would have a greater burden to bear in that situation. But if you look at Sahat. What's the difference between my hypothetical and a riff, other than the language that they use? It's the test that had been applied by this court. So the replacement test that has been applied by this court has only been applied in a reduction-of-force-type situation. And I'm glad that my opponent brought up Sahat. I understand it's only been done in a reinforcement RAF situation. I'm asking why that wouldn't be an RAF situation. How do we tell what's an RAF? If having eight people reduced to seven and taking the eighth person's job and spreading out among the seven is not a riff, what is a riff? I think that that would be a riff. I thought you said that would not be a riff. If that would be a riff, how is it different from spreading it? You have two people, and you just take it and spread it out among the other one. Two reasons, Your Honor. One is that in this case, this is an aspect that this defendant has already brought to its breast. They've said, you were terminated for cause. That's what they said. I understand the notice difference. But as a justification difference, what? A lot of times you have a riff. You have eight people, and you get rid of one, and you don't replace him. Instead, you spread it out among the other seven, which you say may well be a riff. They'll pick the person who's violated the most rules or who's been the weakest salesperson or whatever. It's still a riff. And if you can show that that decision was infected with some other evidence, you can probably still get relief. But if you can't, it's not a prima facie case in the same sense. That's what I'm asking. You seem to be saying because it's two reduced to one, it's categorically different from eight reduced to seven. No, I don't think it is. I don't think it is. I think it's categorically different if we're talking about a termination for cause type situation or a reduction in force. The only thing that keeps this from being a riff is that they explained it by saying you were the one that got riffed as opposed to the other one because you had this weakness in your record. Well, they've said that it's a termination for cause, yes. That's an official position that they've taken in front of an administrative body in Kentucky. And I would also point out that Sahadi, Barnes, all these other cases that we're talking about that are reduction in force cases don't look at the replacement rule as a bright line rule that would preclude recovery. And I think we're on the same page with that. Thank you, Your Honor. Thank you. Thank you both for your argument. The case will be submitted. And would the clerk adjourn court, please?